925 F.2d 1462
 137 L.R.R.M. (BNA) 2056
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
ARMCO STEEL COMPANY, L.P., Plaintiff-Appellee,
v.
Donald TACKETT, Mark Rutledge, Scott Williams, Joe Ramey,
Defendants-Appellants.
 No. 90-5496.
 United States Court of Appeals, Sixth Circuit.
 Feb. 21, 1991.
 
 Before MILBURN and RALPH B. GUY, Jr., Circuit Judges, and BAILEY BROWN, Senior Circuit Judge.
 PER CURIAM.
 
 
 1
 Defendants Donald Tackett, Mark Rutledge, Scott Williams, and Joe Ramey (the truckers) appeal a preliminary injunction issued against them. 28 U.S.C. Sec. 1292(a). Finding no abuse of discretion on the part of the district judge, we affirm.
 
 I.
 
 2
 Armco Steel Company is a large steel manufacturer with plants in Middletown, Ohio, and Ashland, Kentucky. To transport material between the two plants, Armco relies on contracts with 55 different common carriers rather than maintaining its own truck fleet. The common carriers may have their own trucks and employee drivers, they may lease equipment from independent owner-operators, or both.
 
 
 3
 After deregulation, competition increased and haul rates decreased. Since the independent operators are paid a percentage of the haul rate, their income declined. As a result, a group of the independents banded together for the purpose of demanding that the common carriers increase their haul rates. An organizational and strategy meeting was held at Greenup Dam, Ohio, in January 1990.
 
 
 4
 Starting on January 28, 1990, Armco began to experience severe disruptions in transportation services because of threats and violence directed at drivers and companies who continued to haul for Armco at the established rates. By February 12, 1990, 50 different incidents of violence occurred, including incidents in which the use of firearms was involved.
 
 
 5
 Pressure was also put upon trucking company owners. For example, Harry Childers, owner of Machinery Hauling, was "visited" on January 31, 1990, by a convoy of 41 independent truckers who demanded that he "shut down" until all carriers received higher rates from Armco. Defendant Rutledge was the spokesperson for this group, and he told Childers that "nobody is going to be allowed to run."[1] When Childers refused to shut down, he began to experience difficulties that culminated with his son-in-law, who was one of his drivers, being shot from ambush while hauling Armco products.
 
 
 6
 Another incident involved Edna Show, terminal manager for Aetna Freight Lines. Defendants Tackett and Rutledge came to her home on January 31, 1990, along with 10 carloads of independent drivers, and demanded higher rates. Subsequent to this meeting, when the rates were not raised, Show received threatening phone calls and her terminal building was burned down by unknown individuals.
 
 
 7
 Trooper R.H. Scott, a member of the Ohio Highway Patrol, testified at the hearing on the preliminary injunction and stated that since February 4, 1990, he had investigated 32 separate incidents of violence directed at trucks hauling steel, of which 12 involved the use of firearms.
 
 
 8
 Other incidents could be related,[2] but suffice it to say that, at the hearing on the preliminary injunction, there was testimony that implicated all the defendants as playing prominent roles in the independents' struggle for higher rates, although there was no testimony specifically linking any defendant to a discrete act of violence.[3]
 
 
 9
 On February 2, 1990, Armco filed this action seeking, among other things, injunctive relief. Although Armco sought a broad range of injunctive relief,[4] the district court's preliminary injunction, which issued on February 27, 1990, only enjoined the defendants from
 
 
 10
 1. preventing, through acts of violence, vandalism or otherwise, the hauling of products to and from Armco's plants;
 
 
 11
 2. following, trailing, threatening, or intimidating Armco contract motor carriers, their agents or employees and all other persons transporting plaintiff's products, materials, or supplies and from verbally or physically hindering or preventing said persons in their use of the public streets and highways in the performance of any work for Armco; and
 
 
 12
 3. protecting, aiding, abetting, or assisting anyone in the commission of the said acts described herein.
 
 
 13
 (App. at 40).
 
 II.
 
 14
 Defendants' first appeal argument is that the district court had no jurisdiction due to the anti-injunction proscriptions of the Norris-LaGuardia Act, 29 U.S.C. Sec. 104. We disagree. Although the Act clearly limits the power of the court to issue injunctions in "labor disputes," we do not find a labor dispute here within the purview of Norris-LaGuardia. In International Union United Automobile, Aerospace and Agricultural Implement Workers of America v. Lester Engineering Co., 718 F.2d 818, 823 (6th Cir.1983), we indicated that "[t]he term labor dispute ... does not include controversies upon which the employer-employee relationship has no bearing." We indicated in Lester that the employer-employee relationship had to be the matrix of the dispute. Such is not the case here. The independent operators are not the employees of Armco or, for that matter, the employees of anyone. The facts here are similar to those in Colombia River Packers Ass'n v. Hinton, 315 U.S. 143 (1942). In Hinton, a group of independent fishermen attempted to "pressure" a large fish processor into buying fish only from their group. Upon the processor's refusal, the fishermen stopped selling fish to the processor, making it impossible to get the fish necessary to carry on its business. The Supreme Court concluded that this controversy did not involve a "labor dispute" and injunctive relief was not barred by Norris-LaGuardia. In reaching this result, the Court stated in language that is applicable here: "The sellers are not employees of the petitioners or of any other employer, nor do they seek to be. On the contrary, their desire is to continue to operate as independent businessmen...." 315 U.S. at 147.
 
 III.
 
 15
 Defendants also argue that the district court's preliminary injunction violated 29 U.S.C. Sec. 106, which provides:
 
 
 16
 No officer or member of any association or organization, and no association or organization participating or interested in a labor dispute, shall be held responsible or liable in any court of the United States for the unlawful acts of individual officers, members, or agents, except upon clear proof of actual participation in, or actual authorization of, such acts, or of ratification of such acts after actual knowledge thereof.
 
 
 17
 In reviewing the grant or denial of a preliminary injunction, we apply an abuse of discretion standard:
 
 
 18
 The standard of review on appeal from the grant or denial of a preliminary injunction is limited to a determination of whether the district court abused its discretion. A district court abuses its discretion when it relies on clearly erroneous findings of fact, or when it improperly applies the law or uses an erroneous legal standard.
 
 
 19
 There are four factors to be considered in determining whether the grant or denial of a preliminary injunction was an abuse of discretion: (a) the likelihood of success on the merits of the action, (b) the irreparable harm which could result without the relief requested, (c) the impact on the public interest, and (d) the possibility of substantial harm to others. Although these four factors must be considered in assessing a request for a preliminary injunction, the four factors do not establish a rigid and comprehensive test for determining the appropriateness of preliminary injunctive relief. Instead, the district court must engage in a realistic appraisal of all the traditional factors weighed by a court of equity.
 
 
 20
 Christian Schmidt Brewing Co. v. G. Heileman Brewing Co., 753 F.2d 1354, 1356 (6th Cir.), cert. dismissed, 469 U.S. 1200 (1985) (citations omitted).
 
 
 21
 In upholding the issuance of the preliminary injunction, we make no judgment on the merits beyond that necessary to evaluate the "likelihood of success" prong of the fourpart test we look to in reviewing the granting of injunctive relief. The record amply supports that lawless acts are being committed, seriously endangering life and property, and that injunctive relief is appropriate. It may be that, after a full trial, there will be insufficient evidence to tie these defendants closely enough to the wrongful conduct to ground liability. However, for the purposes of interim relief, there was a sufficient nexus shown between the concerted activities of the independent truckers and the wrongful conduct to justify the preliminary conclusion that responsibility should be placed at the doorstep of the independents. There was also a sufficient showing of the specific activities of these individual defendants to avoid the section 106 proscription against vicarious liability. The trial judge, faced with a life-threatening situation, does not need to have proof positive before a preliminary injunction is issued. Also, the defendants are properly enjoined even if they only help to generate the wrongful acts by creating the "climate" of hostility between the parties and then continue to generate confrontation after wrongful acts occur. They need not personally participate in an actual wrongful act. At the preliminary injunction stage at least, if, figuratively speaking, the defendants load the gun, they cannot escape responsibility by claiming someone else pulled the trigger. Curreri v. Local 251, International Brotherhood of Teamsters, 722 F.2d 6 (1st Cir.1983).
 
 
 22
 We also note, but find it unnecessary to decide, that it is not clear that the independent truckers would constitute an "association or organization" within the meaning of section 106. Similarly, it is even less clear whether the conflict here would qualify as a "labor dispute" within the purview of section 106. Given our analysis of this term as used in the Norris-LaGuardia Act, we would have serious reservations about whether these activities would fall within the definition of a "labor dispute" under section 106.
 
 
 23
 The situation here cried out for relief, and we believe the district judge acted within his discretion in ordering temporary injunctive relief.
 
 
 24
 AFFIRMED.
 
 
 
 [1]
 There was testimony at the hearing that one of the truckers pointed a gun at Childers during this confrontation
 
 
 [2]
 Armco also offered testimony showing how it had been harmed by its inability to ship materials and products as a result of the complained of activities
 
 
 [3]
 Two of the defendants named in the original suit, Potacheck and Spurlock, signed a consent order prior to the issuance of the preliminary injunction, and they are not parties to this appeal
 
 
 [4]
 Armco's complaint seeks relief, inter alia, under sections one and two of the Sherman Act, 15 U.S.C. Secs. 1 and 2; sections four and 16 of the Clayton Act, 15 U.S.C. Secs. 15 and 26; the Hobbs Act, 18 U.S.C. Sec. 1951, and the Racketeering-Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. Sec. 1962